This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: July 16, 2018**

**NO. S-1-SC-36164**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**IVAN CALES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Sarah C. Backus, District Judge**

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
John Kloss, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**NAKAMURA, Chief Justice.**

**{1}** Defendant Ivan Cales was convicted of first-degree murder and tampering with evidence. He was sentenced to life imprisonment plus six years. Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA grant us jurisdiction over his direct appeal. Cales challenges the sufficiency of the evidence, argues that the district court admitted evidence in error, asserts that his trial counsel was ineffective, and contends that these errors—taken together—constitute cumulative error. He asks that we reverse his "conviction." We reject these arguments and affirm Cales' convictions. We issue this non-precedential decision because the issues presented have been sufficiently addressed in existing New Mexico case law. Rule 12-405(B)(1) NMRA.

**I.    SUFFICIENCY OF THE EVIDENCE**

**{2}** Cales claims that the State failed to submit sufficient evidence to support his first-degree murder conviction. Specifically, Cales contends that "the court cannot affirm his guilt because the evidence of his intent to commit first degree murder was

insufficient." He asserts, in support of this claim, that there was no evidence presented that he shot and killed the victim, no forensic evidence linking him to the homicide, no witness testimony that he killed the victim, and no forensic or testimonial evidence that he killed the victim in reaction to an earlier argument. The nature of these arguments compel us to offer some preliminary remarks before attending to the merits of Cales' sufficiency claim.

**{3}** The specific question presented is whether the State submitted sufficient evidence to support the jury's determination that Cales did act with the mens rea for first-degree murder. Yet Cales' varying and broad assertions about how the evidence was allegedly deficient appear designed to establish that Cales was not responsible for the victim's death. It is unclear how Cales' broad assertions bear on the specific question presented, and we remind counsel that we do "not review unclear arguments, or guess at what [the litigants'] arguments might be." *Dominguez v. State*, 2015-NMSC-014, ¶ 15, 348 P.3d 183 (alteration in original) (internal quotation marks and citation omitted). Nevertheless and despite the shortcomings of Cales' sufficiency challenge, we proceed to review the merits of this claim.

**{4}** "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and

resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis, internal quotation marks, and citations omitted). "[J]ury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (internal quotation marks and citation omitted).

{5}     Cales' jury was properly instructed that to find him guilty of first-degree murder by a deliberate killing the State was required to establish that

1.     The defendant killed Roxanne Houston;

2.     The killing was with the deliberate intention to take away the life of Roxanne Houston;

3.     This happened in New Mexico on or about the 13th day of June, 2014.

The jury was also instructed as follows:

A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A

4

mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

Our case law further clarifies that "[i]ntent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Duran*, 2006-NMSC-035, ¶ 7, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citations omitted). For this reason, we have explained that, "[i]n determining whether a defendant made a calculated judgment to kill, the jury may infer intent from circumstantial evidence; direct evidence of a defendant's state of mind is not required." *State v. Guerra*, 2012-NMSC-027, ¶ 28, 284 P.3d 1076.

{6}     The State presented the following evidence to Cales' jury in support of its claim that Cales killed the victim with deliberate intent. Cales expressed interest in Native American philosophy and the history and lore of "skinwalkers" or Native American witches. Cales stated that, "if a native found [a skinwalker,] that they would kill them." Cales made a detailed drawing of a Native American "witch hunter" walking away from a slain body. Cales made remarks that Native Americans kill witches who curse people and that he would feel justified in killing someone who cursed him. Cales claimed to be part Native American. He also claimed that the victim once made spell-casting motions over him with her hands, and he considered the victim to be a

5

witch and a practitioner of witchcraft. Cales harbored animus towards the victim and frequently stated that he did not trust her. Cales' jury was provided with the following additional evidence.

{7} The victim was killed by a single gunshot to the center of her forehead. Witnesses testified that Cales possessed a distinctive and high-powered handgun. Cales boasted—after the victim's disappearance—that his handgun could fire a projectile through someone's head. Yet, Cales informed law enforcement that he did not own a handgun. The State's forensic expert testified that, although she could not say with any certainty that the handgun Cales possessed fired the bullet that killed the victim, she observed similarities between test bullets fired from Cales' handgun and the bullet found in the victim's skull. Lastly, we note that Cales' jury also learned that he slipped away before attending a follow-up police interview, went into hiding, drastically changed his appearance, and pretended to be mute when officers finally encountered him again.

{8} The evidence discussed above is sufficient to support the jury's determination that Cales acted with deliberate intention when he killed the victim. That evidence showed that Cales had reason to kill the victim, murdered her in an execution style, lied about owning the type of weapon that was used to perpetrate the killing, and

attempted to evade capture for his offense. *See State v. Flores*, 2010-NMSC-002, ¶ 23, 226 P.3d 641 ("[E]vidence of flight or an attempt to deceive the police may prove consciousness of guilt." (internal quotation marks and citation omitted)); *State v. Rojo*, 1999-NMSC-001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (concluding that evidence bearing on the method used to kill the victim was adequate to support a conclusion that the killing was deliberate). We reject Cales' sufficiency challenge.

## II.      EVIDENTIARY ISSUES

### A.      Video Footage of the Police Interview

{9}      Cales argues, citing *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1, that the district court erred by admitting the video of the second police interview of Cales because he had "not waived his *Miranda* rights prior to the interrogation . . . ." Preliminarily, we observe that Cales' brief in chief inadequately describes the circumstances surrounding the admission of the video and what, precisely, was errantly admitted. While we acknowledge that this argument is advanced under *Franklin* and *Boyer*, Cales' failure to dedicate sufficient discussion to the facts surrounding the admission of the video makes it very challenging to meaningfully review his argument that the video's admission is grounds for reversal of his convictions. Moreover, Cales' naked

assertions force the State and this Court to expend time and resources on basic matters—like what happened and when—to which Cales' appellate counsel should have attended. "This court will not search the record to find error upon which the trial court may be reversed." *State v. Weber*, 1966-NMSC-164, ¶ 37, 76 N.M. 636, 417 P.2d 444. Nevertheless, we have independently reviewed the record and are persuaded that Cales' arguments about the video are entirely without merit.

{10} The district court first considered the admissibility of the video at a March 11, 2016 motion hearing. At that hearing, the court denied Cales' motion to suppress the video and emphasized that Cales had been *Mirandized* prior to making the statements captured in the recording.

{11} Cales submitted the motion to suppress the video only one day prior to the motion hearing and the motion hearing itself was scheduled only four days before trial. On the day of the motion hearing, the district court received a fifty-seven-page transcript of the video. The district court did not view the actual video and we cannot tell from the record whether the court was ever asked to do so before a portion of the video was shown to the jury. This sequence of events precluded the district court from adequately comprehending the details of the officers' interactions with Cales.

{12}     At trial, and after laying the necessary foundation, the State began to play the interview for the jury. The jury viewed a roughly ten-minute conversation between Cales and two officers. This conversation occurred before Cales received his *Miranda* warnings.

{13}     In the portion of the video played to the jury, the officers effectively informed Cales—as the district court ultimately found—that he could decline to speak to them and exercise his rights but that this would ensure that he would spend the next year-and-a-half incarcerated awaiting a jury trial where he was likely to be sentenced to lifetime imprisonment. The officers alternatively suggested that Cales could speak with them and that they could, in turn, speak with the presiding judge. In response to the varying statements made by the officers, Cales made only three short statements during the ten-minute portion of the video: "You're wrong;" "I don't know, I don't have to [tell you,];" and "I don't want [your help]."

{14}     The video was stopped, at Cales' request, seconds before the officers issued Cales' *Miranda* warnings, and a bench conference ensued. At that conference, Cales renewed his motion to suppress the video of the second interview, and the district court informed the parties that it did not realize that a significant exchange had occurred between the officers and Cales prior to them issuing *Miranda* warnings. The

9

court expressed preliminary agreement with Cales that the officers appeared to be engaged in improper coercive tactics.

{15} After excusing the jury from the courtroom, the district court invited the parties to present argument on the issue of Cales' renewed suppression motion. But before receiving argument, the district court offered a point of clarification.

> Previously, I ruled that this interview could be admitted because the *Miranda* warnings were made. This conversation that's going on right before the tape was paused—where Mr. Cales is being told he could serve thirty-three years, and they're his only hope for a lesser sentence, that talking to them can only help him—I believe, based upon our earlier conversation last week about this that that occurred after he had been *Mirandized.* And, uh, I mean, they keep saying 'you don't have to talk to us, it's up to you,' but then they keep pressuring him to talk to them with essential threats of life imprisonment. And I'm real concerned about that and that's what [defense counsel] brought up. I think that there is a violation of *Miranda.* I think *Miranda* warnings have to be given clearly and explicitly before the person is questioned and interviewed in any way, and that any time a person says 'I don't want to talk to you,' that has to be respected and the interview has to end. And, so I think I just made [defense counsel's] arguments for him but I need to hear from the State.

{16} The State responded that the district court had been presented with a copy of the transcript where the pre-*Miranda* exchange was plain to see and expressed surprise that the court had not addressed this concern at the motion hearing. To this, the court admitted that it clearly "misunderstood" when and under what circumstances Cales was given the *Miranda* warnings and also pointed out that

10

this transcript was given to me on Friday, at the time of the hearing. I'd seen the other one, and read the other one in its entirety. But this one was given to me at the time and so, I didn't see where the *Miranda* warnings were given, I was just told that they were given.

At this juncture, defense counsel interjected and suggested that he was, in all fairness, partly to blame for the district court's confusion and oversight.

{17}   In the end, the district court concluded that Cales was coerced into waiving his *Miranda* rights and determined that the remainder of the video would not be played to the jury. The court consulted the parties with respect to what the jury should be told, and after the jury returned to the courtroom, the court addressed them as follows:

Ladies and Gentlemen, I'm just gonna tell you what happened here. With regard to the second interview that you were just viewing portions of, the issue of whether or not the *Miranda* warnings were effectively given was brought to my attention before we started trial, and I didn't have the benefit of watching the video, I hadn't watched it. And during the break what I decided was that this, the way that the warnings were given effectively violated what you all know as the *Miranda* rule which says that you're, the rights that you have, need to be, you need to be advised of those prior to any custodial interrogation. And those are, you've heard them on T.V., the right to remain silent, the right to counsel, et cetera, the right to an attorney. So, we're not going to be reviewing the remainder of the, this particular interview. And, I'm gonna ask that you not speculate as to what may or may not have been said during that interview. And, we'll go forward. So, also, counsel for the State, I'm not faulting them, because they did, we did discuss this before the trial started and I was not as quite as informed about what was on that video, so it's really not their fault and please don't hold it against them either.

11

{18} We are not, in this case, concerned with whether the district court correctly determined that the officers coerced Cales or whether the video footage was correctly suppressed. All that we are asked to decide is whether the errant admission of the portion of the video inadvertently played for the jury is grounds for reversal.

{19} "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful . . . [and] the State bears the burden of proving that the error is harmless." *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110. The error that occurred here was of constitutional dimension; statements were elicited from Cales before the officers read him his *Miranda* rights. Accordingly, the error here may be deemed "harmless only if we conclude that there is no reasonable possibility the error contributed to the jury's decision to convict [Cales]." *Id.* ¶ 45.

{20} The statements Cales made in the ten-minute portion of the video that was errantly played were non-incriminating. Cales himself acknowledges this fact. Moreover, as soon as the district court realized that the video was inadmissible, it immediately stopped its playback and issued a curative instruction. "[G]enerally, a prompt admonition . . . to the jury to disregard and not consider inadmissible evidence sufficiently cures any prejudicial effect which might otherwise result." *State v. Armijo*, 2014-NMCA-013, ¶ 9, 316 P.3d 902 (alteration omitted). There is no

possibility that the portion of the video errantly admitted could have affected the jury's verdict. We conclude that its admission was harmless error.

**B.      Character Evidence**

{21}     Cales argues that inadmissible character evidence, offered by witness Raymond Martinez, was erroneously admitted at trial in violation of Rule 11-404(A) NMRA. Martinez and Cales were incarcerated together, and Martinez testified that "Cales told him he believed [the victim] was a witch." Martinez "also identified several drawings made by . . . Cales," one of which depicts a "witch hunter" slaying a witch. Cales argues that the "sole purpose of Mr. Martinez's testimony was to infer Mr. Cales killed [the victim] in conformity with his character[, a] use clearly prohibited by Rule 11-404 NMRA." This argument is also woefully underdeveloped; Cales dedicates less than a single page of writing to it.

{22}     Character evidence is inadmissible when it is used to "prove that on a particular occasion the person acted in accordance with the character or trait." Rule 11-404(A). We do not agree that Martinez's testimony that Cales thought the victim was a witch and drew a picture of a witch hunt that resulted in the death of a witch is character evidence. "'Character' is a propensity that is both general (i.e. propensity for 'honesty' or 'dishonesty,' 'violence' or 'non-violence') as opposed to specific (i.e.,

13

propensity for executing certain kinds of violent or dishonest acts, or for executing them in a certain manner) and possessed of good or bad moral connotations." *State v. Lamure*, 1992-NMCA-137, ¶ 44, 115 N.M. 61, 846 P.2d 1070 (Hartz, J., specially concurring) (internal quotation marks and citation omitted). Martinez's testimony was not offered to prove that Cales had a propensity to kill witches, that his belief in witchcraft was evidence of a murderous nature, or that he was in some way morally flawed as a consequence of his belief that witches should be killed. Rather, Martinez's testimony was offered to establish that Cales had a specific reason to kill this particular victim and that, when he did so, he acted with deliberate intention. The admission of Martinez's testimony did not violate Rule 11-404(A).

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

{23}   Cales claims that his trial counsel was ineffective for failing to move for a mistrial when the portion of the video of the second police interview was played in error. He alleges that "trial counsel acknowledged his ineffectiveness for failing to move for a mistrial . . . ." This argument is neither adequately developed nor supported by sufficient authority. Indeed, Cales has not even identified where in the record trial counsel allegedly conceded ineffectiveness. These failings are significant and we could reject Cales' argument as a consequence of them. *See State v. Cooper*,

14

1998-NMCA-180, ¶ 27, 126 N.M. 500, 972 P.2d 1 ("Because Defendant has not offered any facts of record or citations to authority to support his position on these issues, we do not address them."). Despite these shortcomings, we will, as before, address the merits of Cales' argument.

{24}   A prima facie case of ineffective assistance of counsel requires that a defendant establish that "(1) counsel's performance fell below that of a reasonably competent attorney; (2) no plausible, rational strategy or tactic explains counsel's conduct; and (3) counsel's apparent failings were prejudicial to the defense." *State v. Bahney*, 2012-NMCA-039, ¶ 48, 274 P.3d 134. Cales has not met his burden.

{25}   As we have already explained, the erroneous admission of the portion of the interview did not prejudice Cales. Its admission was harmless error. Moreover, the court issued a curative instruction directing the jury not to rely on the wrongly admitted evidence. Trial counsel did not err in failing to move for a mistral when portions of the video were admitted in error and did not provide ineffective assistance of counsel as alleged by Cales.

**IV.   CUMULATIVE ERROR**

{26}   Cales contends that the district court's alleged errors "accumulate to the point of rendering the verdict inherently unreliable." We disagree.

15

**{27}** "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. "Where there is no error to accumulate, there can be no cumulative error." *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 (alteration, internal quotation marks, and citation omitted).

**{28}** The discussion in the previous sections of this decision shows that there was no accumulation of errors in this case: (1) the evidence presented was not insufficient; (2) no evidence was admitted in violation of Rule 11-404(A); (3) trial counsel was not ineffective; and (4) while a portion of the video of the interview was admitted in error, that error did not prejudice Cales and the court issued a curative instruction directing the jury not to rely on the wrongly admitted evidence. We reject Cales' cumulative error claim.

**{29}** For the reasons discussed above, Cales' convictions are affirmed.

**{30}** **IT IS SO ORDERED.**

16

_____

**JUDITH K. NAKAMURA, Chief Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL, Justice**

_____

**GARY L. CLINGMAN, Justice**

17